**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| NICOLE PETERS, | CASE NO. 1:24-CV-00026 |
| Plaintiff, | JUDGE DAVID A. RUIZ |
| vs. | MAGISTRATE JUDGE AMANDA M. KNAPP |
| COMMISSIONER OF SOCIAL SECURITY ADMINISTRATION, | **REPORT AND RECOMMENDATION** |
| Defendant. | |

Plaintiff Nicole Peters ("Plaintiff" or "Ms. Peters") seeks judicial review of the final

decision of Defendant Commissioner of Social Security ("Commissioner") denying her

applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income

("SSI").  (ECF Doc. 1.)  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This matter

has been referred to the undersigned Magistrate Judge for a Report and Recommendation

pursuant to Local Rule 72.2.  For the reasons explained below, the undersigned recommends that

the final decision of the Commissioner be **AFFIRMED**.

## I.    Procedural History

On March 16, 2021, Ms. Peters protectively filed applications for DIB and SSI, alleging a

disability onset date of February 11, 2020.  (Tr. 19.)  She alleged disability due to multiple

sclerosis ("MS"), diabetes, leg swelling, neuropathy, fatigue, depression, anxiety, and trouble

with her hands.  (Tr. 110, 132.)  Ms. Peters's applications were denied at the initial level (Tr.

109-25) and upon reconsideration (Tr. 128-43), and she requested a hearing (Tr. 144-45).  On

1

December 5, 2022, a telephonic hearing was held before an Administrative Law Judge ("ALJ"). (Tr. 38-65.)

On January 16, 2023, the ALJ issued a decision, finding Ms. Peters not disabled from February 11, 2020, through the date of the decision.  (Tr. 16-37.)  Ms. Peters sought review of the ALJ's decision by the Appeals Council.  (Tr. 190-92.)  On November 14, 2023, the Appeals Council found no reason to review the decision, making the ALJ's January 16, 2023 decision the final decision of the Commissioner.  (Tr. 1-7.)

On January 5, 2024, Ms. Peters filed a Complaint challenging the Commissioner's final decision denying her social security disability benefits.  (ECF Doc. 1.)  The matter is fully briefed.  (ECF Docs. 7, 9, 10.)

## II.    Evidence

### A.    Personal, Educational, and Vocational Evidence

Ms. Peters was born in 1972.  (Tr. 212.)  She had past work as a cook helper, store's laborer, machine operator, graphic designer, and short order cook.  (Tr. 46-55, 60-61.)

### B.    Medical Evidence[1]

#### 1.    Relevant Treatment History

On August 7, 2020, Ms. Peters presented to Rebekah Crawford, D.O., at University Hospitals to establish care with a new primary care physician.  (Tr. 442-46.)  She complained of numbness, burning, and tingling in her feet and said she felt off balance during the past two to three weeks.  (Tr. 442.)  She reported a prior diagnosis of prediabetes and was interested in a

---

[1] Ms. Peters alleges disability due to physical and mental impairments.  (Tr. 110, 132.)  But her assignment of error relates only to the ALJ's consideration of her physical impairments, specifically the ALJ's exclusion of an assistive device from Ms. Peters's RFC.  (ECF Docs. 7 & 10.)  Thus, the medical evidence summarized is generally limited to evidence related to Ms. Peters's physical impairments.

referral to neurology.  (*Id.*)  A physical examination of her feet was normal, with no swelling, erythema, or dryness.  (Tr. 443.)  She had normal strength in the lower extremities and intact deep tendon reflexes.  (Tr. 444.)  While she had intact sensation in both feet on testing, Ms. Peters reported "somewhat altered sensation."  (*Id.*)  No edema was present and "[l]ower extremity coordination [was] intact on heel to shin bilaterally."  (*Id.*)  But she was "a bit more wobbly than usual when standing still with [her] eyes closed."  (*Id.*)  Dr. Crawford noted that Ms. Peters was in the range for pre-diabetes based on her A1C level of 5.8, and started her on 500 mg of metformin daily because of the numbness and tingling in her feet.  (Tr. 445.)  Dr. Crawford encouraged Ms. Peters to exercise three to five times each week for at least 30 minutes and to follow a healthy diet.  (*Id.*)  Dr. Crawford referred Ms. Peters to neurology and physical therapy for her balance issues.  (*Id.*)

On September 21, 2020, Ms. Peters returned to Dr. Crawford for follow up on her balance issues.  (Tr. 438.)  She reported some improved balance with physical therapy, but more malaise depending on what and when she ate.  (*Id.*)  On examination, there was no edema, her lower extremity strength and deep tendon reflexes were normal, her coordination for "heel glide from knee to foot on opposite leg were difficult," and she showed "less confidence with placing and weight-bearing on right foot."  (Tr. 440.)  Dr. Crawford again encouraged exercise and a healthy diet.  (Tr. 411.)  She provided Ms. Peters with a nutrition referral and instructed her to keep up with physical therapy and the neurology referral.  (*Id.*)

On October 13, 2020, Ms. Peters presented to neurologist Lauren Cameron, M.D., at University Hospitals for evaluation.  (Tr. 335-39, 381-84.)  She reported balance issues for several months, numbness, burning, and tingling in her feet that was worse at night, and leg swelling.  (Tr. 336.)  She reported two falls due to loss of balance since March 2020, without

3

injury.  (*Id*.)  She reported attending physical therapy and using a cane.  (*Id*.)  She had a brain

MRI and spinal tap in the past because of double vision and seeing spots; the brain MRI was

normal, and the spinal tap was inconclusive.  (*Id*.)  On examination, swelling was observed in her

legs, worse on the left.  (Tr. 338.)  Her cranial nerve examination was normal.  (Tr. 339.)  Her

motor examination was also normal, with normal muscle tone in the upper and lower extremities

and normal muscle strength throughout.  (*Id*.)  Her deep tendon reflexes were normal.  (*Id*.)  Her

sensory examination was abnormal in the lower feet and ankles.  (*Id*.)  With respect to

coordination, there was "no limb dystaxia and rapid alternating movements [were] intact."  (*Id*.)

Ms. Peters used a cane, but her gait was normal without spasticity, ataxia, or bradykinesia.  (*Id*.)

Her stance was stable, with a negative Romberg, but wide-based and cautious.  (*Id*.)  Dr.

Cameron ordered a brain MRI, EMG testing, and blood and urine tests.  (Tr. 335.)

On October 27, 2020, Ms. Peters saw Cherie Phillips, M.D., at University Hospitals for

bilateral leg edema and neuropathic foot pain.  (Tr. 329.)  Her examination revealed edema in the

lower extremities.  (Tr. 332.)  Dr. Phillips did not feel her neuropathy was of an arterial origin

because her vascular examination was intact "with normal pedal pulses and triphasic pedal

doppler signal bilaterally," but also felt her symptoms suggested venous insufficiency and

recommended compression stockings and leg elevation as much as possible.   (Tr. 329.)

On October 29, 2020, Ms. Peters presented to Mukash Bhatt, M.D., at University

Hospitals in the oncology department for evaluation and management of anemia.  (Tr. 361-64.)

Her physical examination noted obesity but was otherwise normal, including intact range of

motion and sensation, normal strength and reflexes, and no joint swelling.  (Tr. 362-63.)  Dr.

Bhatt recommended that Ms. Peters continue with oral iron replacement therapy using an over-

the-counter medication.  (Tr. 363.)

4

Ms. Peters's brain MRI from November 13, 2020, showed "[n]umerous white matter . . . changes involving bilateral cerebral hemispheres, brainstem as well as cerebellar hemispheres." (Tr. 430.)  There was "no associated enhancement" and "[s]everal lesions [were] oriented perpendicular to ventricular margins." (*Id.*)  The findings were "suggestive of although not specific for a demyelinating process such as multiple sclerosis." (*Id.*)  On November 16, 2020, Dr. Cameron reviewed the brain MRI results, noting it was likely MS; she planned to refer Ms. Peters to Dr. Abboud. (Tr. 340.)

Ms. Peters had a follow-up appointment with Dr. Bhatt on November 24, 2020. (Tr. 453-56.)  Her physical examination was within normal limits. (Tr. 455.)  Dr. Bhatt reviewed the brain MRI results, noting the results were suggestive of MS. (*Id.*)  He referred Ms. Peters to neurology and recommended that she continue with oral iron replacement therapy. (*Id.*)

Between August 14, 2020, and November 13, 2020, Ms. Peters attended 12 physical therapy appointments at University Hospitals for balance, foot pain, and weakness. (Tr. 475.)  She was discharged from physical therapy on February 26, 2021, having achieved all or most of her significant goals. (*Id.*)  At the time of her last physical therapy visit, it was noted that her balance and strength had improved. (*Id.*)

On January 5, 2021, Ms. Peters attended a telehealth appointment with neurologist Hesham Abboud, M.D., at University Hospitals regarding her complaints of progressive right-sided weakness, frequent falling, and urinary urgency. (Tr. 423-33.)  She reported that she recently had to pull over while driving and call a towing company because she was not able to feel her right foot on the gas pedal and could not drive. (Tr. 425.)  Dr. Abboud reviewed the MRI from November 2020, and concluded that the results were suggestive of secondary progressive multiple sclerosis with activity and progression, but wanted to proceed with testing

to rule out other possible diagnoses.  (Tr. 423.)  Dr. Abboud instructed Ms. Peters to maintain an active lifestyle and healthy diet, develop an exercise routine as tolerated, and return for follow up after additional testing was completed.  (*Id*.)

Ms. Peters returned to Dr. Crawford for follow up on January 7, 2021.  (Tr. 434-37.)  Dr. Crawford found no edema on examination, but started furosemide for leg swelling.  (Tr. 436.)  She also prescribed a disability placard and roller walker, noting that the walker was needed for personal use.  (*Id*.)  Dr. Crawford encouraged Ms. Peters to exercise three to five times a week for at least thirty minutes, follow a healthy diet, and follow up in six months.  (Tr. 437.)

Ms. Peters had an MRI of her cervical and thoracic spine on January 27, 2021.  (Tr. 393-96.)  The MRI findings showed lesions throughout the cervical and thoracic spinal cord that were most consistent with a demyelinating disease such as multiple sclerosis.  (Tr. 394, 396.)  There was mild enhancement suggestive of active demyelination at the T4-T5; otherwise, there was no enhancement to suggest active demyelination.  (*Id*.)  The results also showed mild thinning of the cord at the C6-C7 level next to a demyelinating lesion and mild degenerative changes in the thoracic spine.  (*Id*.)

Ms. Peters attended a follow-up telehealth session with Dr. Abboud on February 2, 2021.  (Tr. 418-22.)  Based on Ms. Peters's test results, Dr. Abboud planned to start Ms. Peters on Vumerity or DMF to treat her MS.  (Tr. 418-19.)

On March 30, 2021, Ms. Peters presented to Lisa Brown, APRN, for a physical examination and to ask questions regarding her diabetes and MS.  (Tr. 471-74.)  She reported taking metformin, and her A1C was good at 5.7.  (Tr. 472.)  She was still worried about feeling unsteady and off balance, and noted that she was recently diagnosed with MS but had not yet started medication for it.  (*Id*.)  She said furosemide helped with her leg swelling.  (*Id*.)  On

6

examination, her pedal pulses were normal and there was no peripheral edema.  (Tr. 473.)  She used a cane, but her gait and station were normal.  (Tr. 474.)

On July 26, 2021, Ms. Peters returned for follow up with Dr. Abboud.  (Tr. 621-30.)  On examination, Dr. Abboud observed "moderate right spastic hemiparesis."  (Tr. 622, *see also* Tr. 627.)  Ms. Peters's 25-foot walking test was timed at 13.6 seconds. (Tr. 626.)  Her gait was described as: "right spastic gait with circumduction."  (Tr. 627.)  Dr. Abboud noted that Ms. Peters was tolerating Vumerity well and her labs were stable.  (Tr. 622.)  Because her examination showed "moderate right spastic hemiparesis," Dr. Abboud started Ms. Peters on Baclofen and referred her to physical therapy.  (*Id*.)  Dr. Abboud recommended that Ms. Peters maintain an active lifestyle and healthy diet, develop an exercise routine as tolerated, and return for follow up in six months.  (*Id*.)

On August 27, 2021, Ms. Peters presented to Jane Murphy-Bryner, APRN-CNP, at University Hospitals for follow up regarding blood pressure issues and swollen feet.  (Tr. 565-69.)  Her roller walker was listed in her current medications with the following reasons noted for its use: balance problems, multiple sclerosis, and paresthesia of bilateral legs.  (Tr. 568.)  It was also noted that Ms. Peters had a disability placard due to multiple sclerosis.  (*Id*.)  Other prescriptions included: furosemide for leg edema and weakness; Baclofen, Vumerity, and Vitamin D for multiple sclerosis; and metformin for neuropathic foot pain.  (Tr. 568-69.)  Her pedal pulses were normal on examination, but she had 1+ edema, greater on the left.  (Tr. 569.)  There was no joint swelling and she had normal range of motion.  (*Id*.)  Her gait and station were noted to be both normal and spastic, and it was noted that she used a walker.  (*Id*.)

Ms. Peters attended 21 physical therapy sessions at University Hospitals from August 31, 2021, through December 2021 to address gait and balance issues secondary to MS.  (Tr. 680-82.)

7

At discharge on December 16, 2021, Therese Lord, PT, noted that Ms. Peters made significant progress towards her therapy goals and had a good understanding of the importance of maintaining a home exercise plan.  (Tr. 681.)  She also noted that Ms. Peters had a fear of falling and used an assistive device.  (*Id*.)

Ms. Peters returned to CNP Murphy-Bryner on December 7, 2021.  (Tr. 570-75.)  She said she had not fallen in the last six months and was using a cane.  (Tr. 571.)  On examination, her coordination and gait were normal, but she was using a four-prong cane.  (Tr. 575.)  Her roller walker and disability placard were again listed in her current medications.  (Tr. 573-74.)

Ms. Peters returned to CNP Murphy-Bryner on May 24, 2022, for follow up regarding blood pressure.  (Tr. 668-72.)  As part of her "Initial Fall Risk Screening," Ms. Peters reported she: had not fallen in the last six months; did not have a fear of falling; did not need assistance with sitting, standing, or walking, including while walking in her home or in unfamiliar settings; and was not using an assistive device.  (Tr. 668.)  But her list of medications continued to list a roller walker and disability placard (Tr. 670-71), and she walked with a cane on examination (Tr. 672).  Her pedal pulses were normal and she had no peripheral edema.  (Tr. 671.)  Her gait and station were normal, but slow and steady, and she walked with a cane.  (Tr. 672.)

On September 6, 2022, Ms. Peters returned to CNP Murphy-Bryner for an annual physical.  (Tr. 655-62.)  In her "Initial Fall Risk Screening," Ms. Peters again reported she: had not fallen in the last six months; did not have a fear of falling; did not need assistance with sitting, standing, or walking, including while walking in her home or in unfamiliar settings; and was not using an assistive device.  (Tr. 655.)  But her list of medications continued to list a roller walker and disability placard.  (Tr. 660.)  On examination, her pedal pulses and peripheral vascular exam were normal and there was no peripheral edema.  (Tr. 661.)  No joint swelling

was observed, and her range of motion, muscle strength, and muscle tone were normal.  (*Id*.)
But her gait was abnormal, demonstrating shuffling and antalgia.  (*Id*.)

### 2.    Relevant Opinion Evidence

On July 6, 2021, state agency medical consultant Daine Manos, M.D., completed a
physical RFC assessment.  (Tr. 73-74.)  Dr. Manos opined that Ms. Peters could: occasionally lift
and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk for a total of 4
hours in an 8-hour workday; sit up to 8 hours in an 8-hour workday; never climb ladders/ ropes/
scaffolds; and occasionally balance, stoop, kneel, crouch, crawl, or climb ramps/stairs.  (Tr. 73-
74.)  Dr. Manos further opined that Ms. Peters would need to avoid all exposure to unprotected
heights, driving, and heavy machinery/equipment.  (Tr. 74.)

On December 30, 2021, state agency medical consultant W. Scott Bolz, M.D., completed
a physical RFC assessment upon reconsideration and affirmed Dr. Manos's physical RFC
assessment.  (Tr. 91-92.)

### C.    Function Report

In an Adult Function Report completed in May 2021 (Tr. 227-234, *see also* Tr. 235-42),
Ms. Peters reported problems with lifting, squatting, bending, standing, reaching, walking,
sitting, kneeling, climbing stairs, and using her hands (Tr. 231).  She said she: could not stand for
a long time; was unstable on her feet and had to use handrails and a cane while climbing stairs;
could not squat, bend, or kneel; had trouble using her hands to hold and grasp things; and could
not tolerate extreme temperatures.  (Tr. 227, 231, 233.)  She reported using both a cane and a
walker, and explained that a roller walker with a seat was prescribed by her doctor on January 7,
2020.  (Tr. 230.)  She used the walker only in her home, and used the cane daily, both inside and
outside her home.  (*Id*.)  She could drive and go out alone.  (Tr. 233.)

Ms. Peters reported difficulty taking care of her personal needs, such as bathing, dressing, and grooming.  (Tr. 233.)  When dressing, she had to sit in a seated position to pull her undergarments, socks, and pants on.  (*Id*.)  When showering, she needed to "use bath window [and] walls for leverage [and] as aid to enter [and] exit shower."  (*Id*.)  She had to use a cane to lower and raise herself from a seated position while using the restroom, and had to use two hands to hold her toothbrush.  (*Id*.)  She reported that her hobbies and interests included reading, watching television, and listening to music.  (Tr. 229.)  Her in-person social interactions were limited because of the pandemic.  (*Id*.)

**D.    Hearing Testimony**

**1.    Plaintiff's Testimony**

At the December 5, 2022 hearing, Ms. Peters testified in response to questioning by the ALJ and her attorney.  (Tr. 46-60.)  She testified about her work history.  (Tr. 46-55.)  When asked why she felt she could not work full-time, she said:

> I have instability as far as my coordination when I sit down.  When I work, I have to work in spurts and I have to use my walker or have to -- which has a seat to sit down in between.  And then if I sit erect, all of the fluids rushes to my ankle, and then it makes it difficult for me to stand up or I might topple over.  So, when I sit down, I have to keep my feet elevated, or when I sit on the couch, I have to lie down or just in a reclining position.  And then also when I [am] just doing daily tasks, when I cook, or when I bathe or when I groom myself, I have to have a system.  Like for instance, when I brush my teeth, I can't -- I have to use both hands or I have to like guide the toothbrush to make sure that I get every tooth.  And then when I take a shower, I have a shower seat.  I have to sit down, then I have to lather myself and then stand up and just even when I cook, I have to -- I -- it's difficult for me to hold a knife.  So, a lot of times, like when I have to ground something, like ground meat, I [have] to use my hands to break it up.

(Tr. 55-56.)  She said she could not work a sedentary position, like one that would involve opening mail while seated, because she had trouble grasping things and dropped everything.  (Tr. 56, 58.)  She also said she got fatigued while sitting and had to lie down a lot or change positions

10

to alleviate "pins and needles" sensations; she also had swelling in her legs and ankles that required her to lie down or elevate her legs above her heart for about eight to ten hours during the day, not including sleeping hours.  (Tr. 59-60.)

Ms. Peters said she had been using a walker for about a year, since 2021.  (Tr. 57.)  She reported that Dr. Crawford ordered the walker after Ms. Peters told her that she was having trouble getting around her apartment.  (Tr. 57.)  She used her walker every day in her apartment, when standing or walking, and used a cane outside her apartment because she always needed some type of assistance when on her feet; she could not take her walker in and out of the apartment because she lived on the second floor.  (Tr. 57-58.)  She reported falling most recently in October 2022, after feeling dizzy while rising from a seated position.  (Tr. 58.)  She estimated she could stay on her feet with an assistive device for about 15 minutes before she needed to sit down, and could sit for about 30 minutes before needing to change positions.  (Tr. 60.)

### 2.      Vocational Expert's Testimony

A Vocational Expert ("VE") testified at the December 5, 2022 hearing.  (Tr. 60-64.)  The VE classified Ms. Peters's past work as follows: (1) cook helper, an unskilled, medium exertional job, performed at light; (2) store's laborer, an unskilled, medium exertional job, performed at medium; (3) machine operator, an unskilled, medium exertional job, performed at light; (4) graphic designer, a skilled, sedentary exertional job, performed at light; and (5) short order cook, a semi-skilled, light exertional job, performed at light.  (Tr. 60-61.)  The VE then testified that a hypothetical individual of Plaintiff's age, education, and work experience with the functional limitations described in the ALJ's RFC determination (Tr. 26) could perform Ms. Peters's past work as a graphic designer (Tr. 61) and other light, unskilled jobs in the national economy, including mail clerk, officer helper, and information clerk (Tr. 62).

11

The VE testified that Ms. Peters's past work as a graphic designer and the information clerk job would remain available if the individual required a cane to ambulate distances greater than 25 feet, but that no jobs would be available if the individual required a cane for both balance and ambulation because use of cane for balance would be work preclusive.  (Tr. 62-63.)  The VE also testified that no jobs would be available if the individual needed to use a walker, because a walker would require the use of both hands.  (*Id.*)  The VE additionally testified that Ms. Peters's past work as a graphic designer would not be available if the individual described in the ALJ's RFC was limited to unskilled work or occasional near visual acuity.  (Tr. 63.)  Finally, the VE provided testimony regarding typical breaks in the workplace and employer tolerances for off task behavior and absenteeism.  (Tr. 63-64.)

### III.    Standard for Disability

Under the Social Security Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]

42 U.S.C. § 423(d)(2)(A).

To make a determination of disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations, summarized as follows:

1.    If the claimant is doing substantial gainful activity, he is not disabled.

12

2.      If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.      If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

4.      If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work.  If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.      If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[2] *see also Bowen v. Yuckert*, 482 U.S. 137, 140–42 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.

*See Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the

Commissioner at Step Five to establish whether the claimant has the Residual Functional

Capacity ("RFC") and vocational factors to perform other work available in the national

economy.  *Id.*

## IV.      The ALJ's Decision

In her January 16, 2023 decision, the ALJ made the following findings:[3]

1.      The claimant meets the insured status requirements of the Social Security Act through June 30, 2024.  (Tr. 22.)

---

[2] The DIB and SSI regulations cited herein are generally identical.  Accordingly, for convenience, in most instances, citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq.  The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds with 20 C.F.R. § 416.920).

[3] The ALJ's findings are summarized.

2.      The claimant has not engaged in substantial gainful activity since February 11, 2020, the alleged onset date.  (*Id.*)

3.      The claimant has the following severe impairments: multiple sclerosis, obesity, hemolytic anemia, and diabetes mellitus; and the following non-severe impairment: adjustment disorder.  (Tr. 22-25.)

4.      The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. 25.)

5.      The claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except she can stand and/or walk for a total of four hours in an eight-hour workday; she can never climb ladders, ropes, or scaffolds; she can occasionally climb ramps and stairs; she can occasionally balance, kneel, crouch, crawl, and stoop; she must avoid all exposure to work at unprotected heights, commercial driving, and being around or operating dangerous moving equipment such as power saws and jackhammers.  (Tr. 26-31.)

6.      The claimant is capable of performing past relevant work as a graphic designer.  (Tr. 31-32.)

Based on the above, the ALJ found Ms. Peters had not been under a disability, as defined in the Social Security Act, from February 11, 2020, through the date of the decision.  (Tr. 32.)

## V.      Plaintiff's Arguments

In her sole assignment of error, Plaintiff argues that the ALJ's omission of an assistive device from the RFC is not supported by substantial evidence.  (ECF Doc. 7, pp. 1, 9.)

## VI.      Law & Analysis

## A.      Standard of Review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009) ("Our review of the ALJ's decision is limited to whether the ALJ

applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence.").

When assessing whether there is substantial evidence to support the ALJ's decision, the Court may consider evidence not referenced by the ALJ. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Hum. Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Hum. Servs.*, 889 F.2d 679, 681 (6th Cir. 1989)). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). "'The substantial-evidence standard . . . presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.'" *Blakley*, 581 F.3d at 406 (quoting *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)). Therefore, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Even if substantial evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

Although an ALJ decision may be supported by substantial evidence, the Sixth Circuit has explained that the "'decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007) (citing

15

*Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546–47 (6th Cir. 2004))).  A decision will also not be upheld where the Commissioner's reasoning does not "build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

**B.      Sole Assignment of Error: Whether the RFC Lacked the Support of Substantial Evidence Because It Did Not Require the Use of an Assistive Device**

In her sole assignment of error, Ms. Peters argues that the ALJ's omission of a hand-held assistive device from the RFC is not supported by substantial evidence (ECF Doc. 7, pp. 1, 10-14; ECF Doc. 10), and that the "ALJ failed to provide logical reasoning which supported her finding that Plaintiff's assistive devices were not medically necessary" (ECF Doc. 7, p. 12).  The Commissioner responds that the ALJ's decision was reasonable and supported by substantial evidence because the evidence does not support a finding that a hand-held assistive device was medically required.  (ECF Doc. 9, pp. 10-19.)  Plaintiff's arguments will be addressed in turn.

**1.      Substantial Evidence Supported Medical Necessity Finding**

The Sixth Circuit has explained that a hand-held assistive device "cannot be considered an exertional limitation" for purposes of an RFC if it "was not a necessary device for claimant's use." *Carreon v. Massanari*, 51 F. App'x 571, 575 (6th Cir. 2002); *see also Drew v. Comm'r of Soc. Sec. Admin.*, No. 1:23-CV-01353-DAC, 2024 WL 2294784, at *9 (N.D. Ohio May 21, 2024) ("The ALJ is not required to incorporate the use of a cane in the RFC unless the cane is medically required.") (citing *Carreon*).  Under Social Security Ruling 96-9p, an ALJ may only "find that a hand-held assistive device is medically required" if the record contains "medical documentation" that: (1) "establish[es] the need for a hand-held assistive device to aid in walking or standing"; and (2) "describ[es] the circumstances for which [the device] is needed (i.e.,

whether all the time, periodically, or only in certain situations; distance and terrain; and any other relevant information)."  SSR 96-9p, 61 Fed. Reg. 34478, 34482 (July 2, 1996).

As to the first requirement, SSR 96-9p calls for medical documentation of "the need for a hand-held assistive device to aid in walking or standing," not simply provider notations that a claimant was observed using an assistive device.  61 Fed. Reg. at 34482; *see Barnes v. Comm'r of Soc. Sec.*, No. 5:21-CV-01688-JDA, 2023 WL 2988346, at *8 (N.D. Ohio Mar. 22, 2023) (collecting cases) ("[T]he fact that various physicians noted Mr. Barnes' use of a cane or a walker does not establish that an assistive device was medically necessary for purposes of SSR 96-9p."); *Phillips v. Comm'r of Soc. Sec.*, No. 5:20-CV-01718-CEH, 2021 WL 5603393, at *10 (N.D. Ohio Nov. 30, 2021) ("Although various medical records note that Claimant presented at appointments using a cane, these notations do not meet the requirements of SSR 96–9p.").

As to the second requirement, SSR 96-9p calls for medical documentation "describing the circumstances for which [the device] is needed (i.e., whether all the time, periodically, or only in certain situations; distance and terrain; and any other relevant information)," not simply a prescription for a device.  61 Fed. Reg. at 34482; *see Barnes*, WL 2988346, at *8 (collecting cases).  This is consistent with the Seventh Circuit's holding that SSR 96–9p requires an "unambiguous opinion from a physician stating the circumstances in which an assistive device is medically necessary."  *Tripp v. Astrue*, 489 F. App'x 951, 955 (7th Cir. 2012); *see also Spaulding v. Astrue*, 379 F. App'x 776, 780 (10th Cir. 2010) ("[T]he legal issue does not turn on whether a cane was 'prescribed' for Spaulding, but whether a cane was 'medically required.'); *Howze v. Barnhart*, 53 F. App'x 218, 222 (3d Cir. 2002) (finding prescription and references to use of cane without discussion of medical necessity to be insufficient to show medical necessity).

Ms. Peters argues that "the facts support the medical necessity of an assistive device" here because: (1) she was prescribed a "roller walker"; (2) subsequent medical notes describe the walker as "needed for personal use" and indicate it was prescribed because of "Balance problem, Multiple Sclerosis, [and] Paresthesia of bilateral legs"; (3) objective signs and symptoms supported the necessity of an assistive device; and (4) she alleged in her function report and testimony that she used a cane and walker.  (ECF Doc. 7, pp. 11-12; ECF Doc. 10, pp. 1-3.)

As an initial matter, the question before this Court is not whether Ms. Peters can present facts that would support a finding of medical necessity.  Even if the evidentiary record contains substantial evidence to support such a finding, this Court cannot overturn the ALJ's finding to the contrary "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones*, 336 F.3d at 477.  This Court is tasked only with determining whether the ALJ *lacked* substantial evidence to support her finding that the use of an assistive device was not medically necessary in this case.

Focusing on the evidence of medical necessity that was highlighted by Ms. Peters, the ALJ's decision reveals that she explicitly considered the following evidence:

- Ms. Peters reported relying on a walker and a cane (Tr. 26);

- She testified that her primary care provider ordered the walker when she "mentioned she was having difficulty moving around her apartment" (*id.*);

- She reported to providers that she used a cane, and was observed using it (Tr. 27-30);

- She was often observed to have a normal gait, sometimes while using a cane (*id.*);

- Abnormal physical examination findings noted at some office visits included: a stance that was stable but wide-based and cautious, lower extremity edema, dragging of the right leg, slightly reduced strength on the right with a distal reduction of vibratory sensation, mild reductions in lower extremity strength, minimal deviations in balance to the right due to lower extremity weakness, slow and steady gait, and a shuffling and antalgic gait at one visit (*id.*); and

18

- Ms. Peters's primary care doctor prescribed a handicap placard and "rollator" walker in January 2021, at a visit with an unremarkable physical examination (Tr. 28).

The Commissioner argues that this evidence is insufficient to support a finding of "medical necessity" because the medical documentation does not meet the second requirement of SSR 96-9p by "describing the circumstances for which [the device] is needed (i.e., whether all the time, periodically, or only in certain situations; distance and terrain; and any other relevant information)."  SSR 96-9p, 61 Fed. Reg. 34478, 34482.  (*See* ECF Doc. 9, p. 12; *see also id.* at 1 (arguing the evidence is insufficient because there is no "unambiguous opinion . . . stating the circumstances in which an assistive device is medically necessary").)

Ms. Peters asserts that the second requirement of SSR 96-9p is met by a notation in some prescription lists which indicates that one "[r]eason" for her walker prescription is a "[b]alance problem."  (ECF Doc. 10, p. 2 (citing Tr. 568, 573, 670).)  This limited notation in a prescription list is clearly insufficient to constitute "medical documentation" that describes the precise circumstances in which an assistive device was medically necessary, as required by SSR 96-9p.  The notation of a balance problem does not specify when, where, or in what terrain the walker is considered to be necessary.  These deficiencies are made more problematic by Ms. Peters's testimony that she only used her walker at home and the fact that the documented provider observations almost universally noted her use of a cane, not a walker.  Given the clear absence of an "unambiguous opinion ... stating the circumstances in which [the] assistive device is medically necessary," Ms. Peters has failed to show that the ALJ lacked substantial evidence to support her conclusion that the assistive devices were not medically necessary.  *Thacker v. Comm'r of Soc. Sec.*, No. 3:21 CV 1617, 2022 WL 3369533, at *3 (N.D. Ohio Aug. 16, 2022) (quoting *Tripp*, 489 F. App'x at 955); *see also Barnes*, WL 2988346, at *8 (collecting cases)

("Mr. Barnes has failed to identify any records describing the precise circumstances in which an assistive device was medically necessary and has thus not met the requirements of SSR 96-9p.").

### 2.    The ALJ Adequately Articulated the Medical Necessity Finding

Ms. Peters argues in the alternative that remand is warranted because the ALJ "failed to provide logical reasoning" to support "her finding that Plaintiff's assistive devices were not medically necessary."  (ECF Doc. 7, pp. 12-15; ECF Doc. 10, p. 3.)  In particular, she argues that the ALJ: (1) erred in concluding that Dr. Crawford prescribed the walker based on Ms. Peters's "subjective complaints" rather than an "observation that she was unable to support herself or ambulate safely" (ECF Doc. 7, p. 13 (quoting Tr. 30)); (2) did not fully discuss the contents of the only medical record mentioned in her analysis (*id.* at p. 14); and (3) did not specifically discuss other records, ultimately providing an analysis that was "cursory at best" (*id.*).

In addressing the medical necessity of Ms. Peters's assistive devices, the ALJ first acknowledged Ms. Peters's statements regarding her use of a walker and cane (Tr. 26) and provided a detailed discussion of the medical records, including diagnoses, prescriptions, subjective reports, and objective findings and observations (Tr. 27-30), before explaining:

> The evidence summarized above provides only partial support for the claimant's allegations.  First, the claimant testified to a need to use a cane or walker.  The record shows that the claimant was given a prescription for handicap placard, and her primary care provider wrote an order for a Rollator walker.  This record was based on the claimant's subjective complaints rather than being based on a physician's observation that she was unable to support herself or ambulate safely.  In short, the actual evidence does not support medical necessity to use a cane as frequently as the claimant alleges. In fact, notes from a September 6, 202[2[4]] primary care visit show that the claimant denied having fallen or needing assistance to sit, stand, or walk either at home or in an unfamiliar setting.  She also denied using an assistive device. (Exhibit 12F/12). The evidence regarding the claimant's ambulation difficulties and use of an ambulation aid support the limitation to

---

[4] Although the ALJ states here that the visit occurred on September 6, 2020, the cited record is dated September 2022.  (Tr. 655.)  The ALJ had discussed the same record in the preceding paragraph using the correct date.  (Tr. 30.)  Plaintiff acknowledges that this discrepancy appears to be a typo.  (ECF Doc. 7, p. 14 n. 5.)

walking/standing no more than four hours in an eight-hour workday but not the greater degree of limitation alleged by the claimant.

(Tr. 30.)  The ALJ then found the opinions of the state agency medical consultants—that Ms. Peters was capable of light work with limitations that included a reduction in standing and walking to four hours in a workday—fully persuasive before concluding:

In summary, the claimant's mobility and agility has been reduced by a combination of obesity and symptoms of MS, such as a subjective feeling of imbalance, and at least mild loss of sensation. This supports the limitation to light exertion, and a reduction in standing and walking to four hours daily in the workplace as well as a preclusion from using ladders, ropes, or scaffolds and environmental limitation that she should avoid all exposure to unprotected heights, commercial driving, or being around/operating dangerous moving equipment.

(Tr. 31.)

Turning first to the walker prescription, the ALJ concluded that the prescription "was based on the claimant's subjective complaints rather than . . . a physician's observation that she was unable to support herself or ambulate safely."  (Tr. 30.)  Ms. Peters argues that this conclusion was not supported by the relevant medical record, and that it was "more logical[]" to conclude that Dr. Crawford based the prescription on her recent MS diagnosis and an examination from four months prior that showed an abnormal gait.  (ECF Doc. 7, p. 13.)  But a review of the entire ALJ decision reveals that the ALJ had already noted—before finding the prescription was based on subjective complaints—both Ms. Peters's testimony that her doctor ordered the walker when she "mentioned she was having difficulty moving around her apartment" (Tr. 26) and Ms. Peters's unremarkable physical examination findings at the same office visit where the walker was prescribed (Tr. 28.)  These observations were consistent with the hearing testimony (Tr. 57) and the relevant medical record (Tr. 436.)  Keeping in mind that this Court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions

21

of credibility," *Garner*, 745 F.2d at 387, the undersigned finds the ALJ's determination that the

walker prescription was based on subjective complaints was supported by substantial evidence.

Turning next to the medical record specifically discussed by the ALJ in her medical

necessity analysis, the ALJ observed: "notes from a September 6, 202[2] primary care visit show

that the claimant denied having fallen or needing assistance to sit, stand, or walk either at home

or in an unfamiliar setting.  She also denied using an assistive device."  (Tr. 30.)  Ms. Peters does

not dispute that those notes appear in that record, but asserts that the ALJ failed to mention that

the physical examination findings for the visit also described an abnormal gait with shuffling and

antalgia bilaterally, and failed to note that her walker remained on her prescription list.  (ECF

Doc. 7, p. 14.)  In fact, the ALJ detailed the same visit in the preceding paragraph, stating:

> Nurse practitioner Murphy-Bryner saw the claimant again in September 2022. . .
> Notes from this encounter show that the claimant had not fallen in the previous six
> months to a year, did not need assistance with sitting, standing or walking and was
> not using an assistive device. Physical examination notes showed that she had a
> shuffling and antalgic gait bilaterally, but there was no swelling observed, her
> cranial examination was normal, and her lungs were clear. . .

(Tr. 30 (emphasis added) (citing Tr. 656-62).)  The undersigned finds no error in the ALJ's

accurate description of the contents of a medical record, notwithstanding that she did not discuss

every finding in that record.  *See Boseley v. Comm'r of Soc. Sec. Admin.*, 397 F. App'x 195, 199

(6th Cir. 2010) (explaining that an ALJ need not discuss every piece of evidence to render a

decision supported by substantial evidence) (citing *Kornecky v. Comm'r of Soc. Sec.*, 167 F.

App'x 496, 507–08 (6th Cir. 2006) (per curiam)); *see also Bledsoe v. Barnhart*, 165 F. App'x

408, 411 (6th Cir. 2006) (finding "ALJ did not err by not spelling out every consideration that

went into the [ALJ's] . . . determination"); *Crum v. Comm'r of Soc. Sec.*, 660 F. App'x 449, 457

(6th Cir. 2016) ("No doubt, the ALJ did not reproduce the list of these treatment records a

second time when she explained why Dr. Bell's opinion was inconsistent with this record. But it

suffices that she listed them elsewhere in her opinion.") (citing *Forrest v. Comm's of Soc. Sec.*, 591 Fed.Appx. 359, 366 (6th Cir. 2014)).

Turning finally to Ms. Peters's argument that the ALJ's discussion of a single medical record rendered the analysis "cursory at best," the undersigned observes that the ALJ had already acknowledged Ms. Peters's statements regarding her use of a walker and cane (Tr. 26) and discussed the medical records at length (Tr. 27-30) before she concluded that "the actual evidence does not support medical necessity to use a cane as frequently as the claimant alleges" (Tr. 30). The ALJ also considered and adopted the opinions of the state agency medical consultants (Tr. 31) before concluding that "the claimant's mobility and agility has been reduced by a combination of obesity and symptoms of MS, such as a subjective feeling of imbalance, and at least mild loss of sensation" and adopting a light RFC with reduced standing and walking (*id.*). The undersigned finds that the ALJ's medical necessity analysis is logical, supported by the record, and sufficient for this Court to conduct a meaningful review of the decision.[5]

Ms. Peters's citation to *Cruz-Ridolfi v. Comm'r of Soc. Sec.*, No. 1:17 CV 1075, 2018 WL 1136119 (N.D. Ohio Feb. 12, 2018), does not alter this conclusion. The *Cruz-Ridolfi* court found an RFC that did not require the use of a cane was "not supported by substantial evidence when the ALJ, (i) acknowledged that a cane had been prescribed, (ii) did not include the use of the cane in the RFC, and (iii) provided no explanation for this omission." *Cruz-Ridolfi*, 2018 WL 1136119, at *15 (internal citations omitted), *report and recommendation adopted,* No. 1:17-CV-1075-JRA, 2018 WL 1083252 (N.D. Ohio Feb. 28, 2018). Here, as discussed above, the

---

[5] As discussed in Section VI.B.1., *supra*, even if the ALJ had more fully discussed the relevant evidentiary records, Ms. Peters has failed to identify any medical records that would have supported a finding by the ALJ that any assistive device was medically necessary under SSR 96-9p.

ALJ provided an adequate explanation for excluding assistive devices from the RFC and the record did not support a finding of medical necessity.

For the reasons set forth above, the undersigned concludes that the ALJ's finding that an assistive device was not medically required was supported by substantial evidence, and further concludes that the ALJ's reasoning provided the necessary logical bridge to allow this Court to conduct a meaningful review of the decision.  The undersigned accordingly finds Ms. Peters's sole assignment of error to be without merit.

## VII.    Recommendation

For the reasons explained, the undersigned recommends that the Court **AFFIRM** the Commissioner's final decision.


December 3, 2024

                                        */s/Amanda M. Knapp*
                                        AMANDA M. KNAPP
                                        United States Magistrate Judge



## <u>OBJECTIONS</u>

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document.  Failure to file objections within the specified time may forfeit the right to appeal the District Court's order.  *See Berkshire v. Beauvais*, 928 F.3d 520, 530 (6th Cir. 2019); *see also Thomas v. Arn*, 474 U.S. 140 (1985).